IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARCIA G. MACKAY, | ) | |
| | ) | |
| Plaintiff-Claimant, | ) | |
| | ) | No. 11 C 283 |
| vs. | ) | |
| | ) | Jeffrey T. Gilbert |
| MICHAEL J. ASTRUE, Commissioner | ) | Magistrate Judge |
| of Social Security, | ) | |
| | ) | |
| Defendant-Respondent. | ) | |

**MEMORANDUM OPINION AND ORDER**

Claimant Marcia Mackay ("Claimant") brings this action under 42 U.S.C. § 405(g), seeking reversal or remand of the decision by Respondent Michael J. Astrue, Commissioner of Social Security ("Commissioner"), in which the Commissioner denied Claimant's application for disability insurance benefits. This matter is before the Court on the parties' cross-motions for summary judgment or remand [Dkt.#19, 26]. Claimant argues that the Administrative Law Judge's ("ALJ") decision denying her application for disability insurance benefits should be reversed and/or that the case should be remanded for further proceedings. Claimant raises the following issues in support of her motion: (1) whether the ALJ sufficiently considered and properly weighed the evidence and the testimony of the medical experts; (2) whether the ALJ properly analyzed Claimant's credibility; and (3) whether the ALJ erred in not properly analyzing date of Claimant's onset of disability pursuant to Social Security Ruling ("SSR") 83-20.

For the reasons set forth herein, Claimant's motion for summary judgment [Dkt.#19] is denied. Respondent Michael Astrue's motion for summary judgment [Dkt.#26] is granted, and the decision of the Commissioner of Social Security is affirmed.

## I. BACKGROUND

### A.     Procedural History

Claimant filed an application for disability benefits on August 19, 2008, alleging a disability onset date of May 1990.[1] R.73, 172-179. Claimant's date last insured was December 31, 1991.[2] R. 73. The Social Security Administration ("SSA") initially denied her application on September 22, 2008. R.73, 84-88. Claimant then filed a request for reconsideration, which the SSA denied on December 17, 2008. R.73, 89-91. Shortly thereafter on January 12, 2009, Claimant requested a hearing before an ALJ. R.73, 96-97.

On February 22, 2010, Claimant appeared with her attorney Kristin Kobayashi and testified at a hearing before ALJ Cynthia Bretthauer. R.73. Vocational expert Susan Entenberg appeared and testified at the hearing. R.73. Ronald Devere M.D., a medical expert, also participated in the hearing and testified via telephone. R.73

---

[1] In her application for disability benefits, Claimant asserted an onset date of June 1, 1989. R.172. At the hearing, Claimant amended her disability onset date to May 1990 based on the opinion offered by a consulting physician Dr. Julian Freeman. R.18.

[2] Because Social Security disability benefits under Title II is insurance against lost income caused by disability, the applicant/worker must show a recent connection to the work force to maintain insured status. 42 U.S.C. § 423(c) and 20 C.F.R. § 404.130. This generally means that the applicant was working in 20 of the last 40 quarters. For an applicant who is 31 years old or older, the "last date of insured status" generally is five years after his or her date of last work.

On March 24, 2010, the ALJ rendered her decision finding that Claimant was not disabled under the Social Security Act. R.73-80. Specifically, the ALJ determined that Claimant "was not under a disability with in the meaning of the Social Security Act from May 1990 through the date last insured." R.73. On May 4, 2010, Claimant then filed a request for review of the ALJ's decision to the Appeals Council. R.9-12.

On November 19, 2010, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. R.1-4. Claimant subsequently filed this action for review pursuant to 42 U.S.C. § 405(g).

## B.     Hearing Testimony – February 22, 2010

### 1. Claimant Marcia Mackay

At the time of the hearing, Claimant was living in Maryhaven Nursing Home where she requires full assistance with her daily activities. R.19. Claimant is a college graduate and has past relevant work experience as a benefits manager and pension coordinator. R.21. Claimant stopped working in 1986 when she had her first child – not because of any symptoms or impairments she had at the time. R.22, 188, 189.

During the time period in question – May 1990 through December 31, 1991 – Claimant suffered from relapsing remitting multiple sclerosis. R.32. At that time, Claimant testified that she cared for her two young children. R.20. One child was in nursery school and the younger child was at home with Claimant. R.20. Claimant testified that she drove her older child to school and that there were no restrictions on her driving license. R.19-20. Claimant testified that she had a babysitter two times per week

but otherwise she was the sole caretaker for the children during the day with some assistance from her husband. R.21.

Claimant testified that prior to stopping work to care for her young children, she was a pension manager or benefits manager at a few different companies. R.21. Claimant testified that during the time period in question, she could not have performed any of her previous jobs because of the fatigue she suffered. R.23. She testified that the fatigue "was incredible, very great" (R.30), that she could not walk very far without needing to rest, that she was having "a little trouble" with her eyesight, and that she had bladder problems and could not lift (R.23).

Claimant acknowledged at the hearing that her medical records at the time indicate that she was doing well, that she was not disabled by her condition and that she was able to function and complete her activities of daily living. R.25. Claimant also acknowledged that her medical records indicate that she had only one episode of mild incontinence at the time; however, she testified that she was "too proud to talk about bladder incontinence at the time." R.25. Claimant acknowledged that her medical records show that she was able to walk without any assistance at the time in question, but Claimant testified that she used her husband's hand sometimes. R.26-27. Claimant testified that she did not recall when she began using a cane and that she did not begin to use a wheelchair until 1998. R.27. Claimant testified that she had difficulty walking for long periods of time and that she had difficulty going up and downstairs because her fatigue was so great. R.30. She testified that she had fatigue with walking or moving her hands repeatedly. R.30. Claimant,

however, stated that she did not have any limitation with sitting.  R.33.  Although Claimant earlier in her testimony stated that she could not lift (R.23), she subsequently testified that she could lift 15 pounds. R.34.

When describing a typical day during the time period May 1990 through December 31, 1991, Claimant testified that she often times woke up later than her husband who helped with the children, but that she changed diapers, took care of the children, including preparing their lunch. R.34. Although not all of the time, Claimant testified that she was able to wash the dishes and cook some meals. R.34-35. Claimant testified that she did not clean the house – either her husband cleaned or she hired a cleaning service. R.35. Claimant testified that she was able to do the laundry. R.35.  She testified that she was able to bathe and dress herself – although maybe she had some help with dressing. R.35.  Claimant testified that she helped part-time with the grocery shopping. R.35.

During that time period, Claimant testified that she enjoyed art and reading as hobbies. R.36.  Claimant testified that she took her children to the library and to the pool but that she always looked for a parking spot close to the door and that if the heat was too much, she had to leave the pool. R.36.  Claimant also testified that she was able to go out to dinner and to the movies. R.37.

Claimant testified that she was not hospitalized and did not require any emergency room visits for her multiple sclerosis during the period from May 1990 through December 31, 1991. R.31.  Claimant testified that she was hospitalized either in 1993 or 1994, and it

was after that hospitalization that her multiple sclerosis diagnosis changed from relapsing remitting to secondary progressive. R.32.

## 2. Vocational Expert Susan Entenberg

Susan Entenberg testified at the hearing as a vocational expert ("VE"). She described Claimant's past relevant work as benefits manager or pension manager. R.62. She testified that Claimant's past relevant work would be categorized as sedentary and skilled. R.62. Assuming an individual who was 33 to 36 years old with the same education and past relevant work experience as Claimant (*i.e.*, sedentary or light work), the ALJ inquired whether an individual could perform the same or similar past relevant work as Claimant with the following limitations: sitting for six to eight hours of the day; standing and walking at least two hours of the day; lifting and carrying, both frequently and occasionally up to ten pounds, with no other restrictions or limitations. R.63. The VE testified that based on the hypothetical given by the ALJ, an individual with the limitations described could perform Claimant's past relevant work. R.63.

## 3. Medical Expert Ronald Devere M.D.

Dr. Devere testified at the hearing via telephone. Based on his review of Claimant's medical records and listening to the testimony offered by Claimant at the hearing, Dr. Devere testified that Claimant suffered from multiple sclerosis prior to her date last insured. R.43  Dr. Devere also testified that Claimant was "quite impaired" at the time of the hearing. R.42. Dr. Devere, however, opined that her condition as of her date last insured did not meet any of the Social Security listing requirements in 11.04B,

11.09, 12.02 A and B based on the medical examinations and her complaints at that time. R.42, 44-46.

During the period in question, Dr. Devere testified that Claimant suffered some impairments, including fatigue, mild gauge trouble with her eyes, some numbness and balance issues with slight unsteadiness, and some numbness and slight coordination issues with her hands. R.43. However, based on his review of Claimant's medical records, Dr. Devere opined that Claimant suffered no visual, mental or cognitive limitations during the period in question. R.50. Notwithstanding Claimant's fatigue, which Dr. Devere acknowledged was a serious complaint, Dr. Devere opined that Claimant during 1990 and 1991 had the functional capacity to perform at least sedentary work and possibly light work with limitations for occasional lifting. R.42-44, 47-48.

## C. Medical Evidence

### 1. Treating Physicians

Dr. Kim Meyers was Claimant's primary care physician during the period of time in question – May 1990 through December 1991. R.24. Currently, Dr. Meena Malhotra is Claimant's primary care physician.[3] R.199. Dr. Lawrence Bernstein, Dr. Floyd Davis, Dr. Henry Lipton and Dr. Afif Hentati are neurologists who have treated Claimant at

---

[3] Dr. Meyers was Claimant's internist until she became a resident at Maryhaven Nursing Home on June 1, 2008 at which time Dr. Malhotra, the internist for Maryhaven, became responsible for monitoring Claimant's general health. R.199.

different times from May 1990 to the present.[4]  R.24-25, 199, 201.  Dr. Hentati is

Claimant's current neurologist. R.199

The medical records show that Claimant first saw Dr. Bernstein on June 2, 1988.

R.390.  Claimant was referred to Dr. Bernstein by Dr. Meyers, Claimant's primary care

physician. R.390. At that time, Claimant complained of numbness in her hip and waist.

R.390.  Dr. Bernstein noted that the examination was normal and that Claimant was given

a referral to return to Dr. Bernstein if the symptoms did not subside. R.390.

Claimant returned to Dr. Bernstein almost two years later on March 14, 1990 with

a "subjective complaint of numbness and of lower extremities, vague difficulty with

holding urine (and one episode of incontinence)." R.89. Dr. Bernstein concluded that "a

feeling that her legs may not be as strong as they were" was supported by his examination

of Claimant. R.89.  Dr. Bernstein communicated with Dr. Meyers after the exam and

noted that Claimant "had another episode of myelopathy" but that "she is not at all

disabled by this. Strength is normal.  Sphincter incontinence is maintained, although she

had one episode of mild incontinence." R388.  Dr. Bernstein also noted at that time that a

---

[4] As Claimant explained in her testimony, Dr. Bernstein treated Claimant until
approximately September 1990. R.24, 358-361.  Claimant testified she changed neurologists
because she wanted to see a multiple sclerosis specialist, and there was not a multiple sclerosis
specialist at Evanston Hospital at that time so she went to Rush Presbyterian-St. Luke's Medical
Center to see Dr. Davis. R.24-25.  She then returned to Evanston Hospital and was treated by Dr.
Lipton and subsequently by Dr. Hentati, who took over Dr. Lipton's practice. R.25.

MRI scan performed in 1988 was negative. R.388.  Dr. Bernstein diagnosed Claimant with a transverse myelopathy.[5] R.388.

Claimant's medical records show that Dr. Bernstein referred Claimant to Dr. Davis at Rush Presbyterian-St. Luke's Medical Center who first examined Claimant on October 9, 1990. R.355-357. Dr. Davis noted at the time that "the onset of her difficulties began in 1988." R.355.  Dr. Davis further noted that in March of 1990 she "developed more numbness in larger areas involving the left side of her body" and had "some weakness involving the left arm and leg" and that Claimant believes that "there might be some weakness in the right leg." R.355. At Claimant's first examination, Dr. Davis concluded that "the diagnosis of multiple sclerosis certainly is possible" but that "a definitive diagnosis . . . will require further documentation." R.356.  According to records from a psychologist, Claimant's multiple sclerosis diagnosis was confirmed by Dr. Davis on November 21, 1990. R.354.  Claimant continued to see Dr. Davis through approximately sometime in 1994.  R.341-361, 363-369.

Claimant returned to Evanston Hospital in January 1994 and sought treatment from Dr. Lipton.  R.24-25, 386. Dr. Lipton first saw Claimant on January 26, 1994 for evaluation and management of her multiple sclerosis. R.386. In reviewing her history, Dr. Lipton noted that in 1988 Claimant developed numbness on her left side which appeared to resolve itself.  R.386.  Then five months after the birth of her second child, in

---

[5] Myelopathy is a term used to refer to any condition that creates problems in the spinal cord.

approximately January 1990, Claimant again developed numbness of her entire left leg and foot. R.386. Dr. Lipton noted that "[s]ince then she has not been able to run or jump and standing for long periods makes her tired. She also tires out in malls; however, she remained relatively stable until 1993." R. 386. Dr. Lipton noted in his history that she had a viral infection in January 1993 and was admitted to the hospital in March 1993 because she was having difficulty walking. R.386-387.

On examination in January 1994, Dr. Lipton noted that Claimant was not in any distress. Her mental status was normal; her pupils were normal; muscle mass and tone were normal "except for a few catches of hypertonicity in the left leg on rapidly flexing the leg at the knee;" strength was excellent "except for mild weakness of hip flexion, left more than right." R.387. Dr. Lipton continued to care for Claimant and to help manage her multiple sclerosis until he released her to the care of Dr. Hentati who took over Dr. Lipton's practice in 2005. R.25, 307.

Claimant currently is under the care of Dr. Hentati who concurred with Dr. Julian Freeman's opinion of November 6, 2009 that "the onset of progressive multiple sclerosis was 1988, and [Claimant] developed disability from multiple sclerosis dating from at least 1990." R.410

## 2.    Julian Freeman M.D.

Claimant submitted a report prepared by Dr. Freeman, an internal medicine physician with a sub-specialty in neurology, for consideration with her application for disability benefits.  R.412-16.  Dr. Freeman is not one of Claimant's treating physicians but rather reviewed her medical records and offered an opinion as to Claimant's medical condition and diagnosis.  Dr. Freeman did not examine Claimant. R.27.

Based on his review of Claimant' medical records, Dr. Freeman opined that Claimant's "medical data demonstrate the presence of multiple sclerosis since 1988, which has been progressive since then." R.412.  Dr. Freeman opined that, in retrospect, Claimant's initial diagnosis of "transverse myelitis" should have been diagnosed as multiple sclerosis but that at the time, doctors lacked awareness that transverse myelitis is often the first stage of multiple sclerosis. R.412.

In his report, Dr. Freeman opined that, based on his review of Claimant' medical records, Claimant's condition met Social Security listing 11.09A and C since at least "10/90 explicitly from the record, and since 5/90 by implication." R.412.  Dr. Freeman notes that section 11.09A considers an individual's ability to use her arms and legs in an effective manner. R.515. Dr. Freeman notes that Claimant fulfills the listing requirements currently and opines that "first date at which this listing section definitely was fulfilled is 10/9/90 when Dr. Davis (in his letter of 10/29/90) provides a history of progressive numbness and weakness on the left, with more recent and less severe right leg weakness, a wide based gait with mild imbalance, decreased rapidly alternating movements in the

feet especially on the right, a mild decrease in rapid alternating movement in the left hand." R.415.

Dr. Freeman also opined that listing section 11.09C, which considers problems of fatigue, would have been established in retrospect as of 1988 with "full confirmation . . . made . . . in October 1990 when Dr. Davis noted the eye involvement (optic nerve pallor), abnormalities of saccadic eye movement, and the clinical signs in the arms and leg (weakness, incoordination, etc.)." R.415

**D.     The ALJ's Decision – March 24, 2010**

The ALJ evaluated Claimant's application under the required five-step sequential analysis.  R.73-75.  At step one, the ALJ found Claimant had not engaged in substantial gainful activity "during the period from her amended alleged onset date of May 1990 through her date last insured of December 31, 1991." R.75.  At step two, the ALJ determined Claimant had a severe impairment: multiple sclerosis. R.75.  At step three, the ALJ found that, through her date last insured, Claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. R.75.  The ALJ explained that "the severity of the impairment did not satisfy the criteria set forth at section 11.09 of the Appendix 1." R.75. In making this determination, the ALJ concurred with the opinion of the medical expert Dr. Devere and assigned little weight to the opinions of a non-treating physician Dr. Freeman and her treating physician Dr. Hentati, which were offered by Claimant in support of her claim for disability benefits. R.75.

The ALJ then considered Claimant's residual functional capacity ("RFC") and found that, through the date last insured, "Claimant had the residual functional capacity to perform at least the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a)."[6] R.77. The ALJ found that Claimant's "medically determinable impairment could reasonably be expected to cause some of her alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of [those] symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." R.78. The ALJ concluded that Claimant's "current allegations regarding her symptoms and limitation during the period at issue are far greater than the degree of limitation supported by the objective evidence." R.79. The ALJ noted that "the record is replete with references to only mild findings during the period at issue." R.76. The ALJ acknowledged that Claimant "complained of fatigue as early as January 1991, significant fatigue is not initially documented in occupational therapy notes until January 1993." R.77.

At step four, the ALJ concluded Claimant could perform her past relevant work. R.80. Because of her step four finding, the ALJ did not make a step five finding and concluded Claimant was not disabled under the Social Security Act and therefore denied her application for disability insurance benefits. R.73-75, 80.

## II. LEGAL STANDARD

---

[6] The RFC is the most that a claimant can do despite the effects of her impairments. 20 C.F.R. § 404.1545(a).

## A.    Standard of Review

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). Under such circumstances, the district court reviews the decision of the ALJ. *Id.* Judicial review is limited to determining whether the decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching his decision. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A "mere scintilla" of evidence is not enough. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). It may not, however, "displace the ALJ's

judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards and whether there is substantial evidence to support the findings. *Nelms*, 553 F.3d at 1097. The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

**B.    Disability Standard**

Disability insurance benefits are available to a claimant who can establish she is under a "disability" as defined in the Social Security Act. *Liskowitz v. Astrue*, 559 F.3d 736, 739-40 (7th Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is under a disability if she is unable to do her previous work and cannot, considering her age, education, and work experience, partake in any gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

A five-step sequential analysis is utilized in evaluating whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i-v). Under this process, the ALJ must inquire, in the following order: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant can perform past relevant

work; and (5) whether the claimant is capable of performing other work. *Id.* Once the

claimant has proven she cannot continue her past relevant work due to physical

limitations, the ALJ carries the burden to show that other jobs exist in the economy that

the claimant can perform. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

## III. DISCUSSION

Claimant raises the following issues in support of her motion for summary

judgment: (1) whether the ALJ sufficiently considered and properly weighed the evidence

and the opinions of the medical experts; (2) whether the ALJ properly analyzed

Claimant's credibility; and (3) whether the ALJ erred in not properly analyzing the onset

of disability pursuant to SSR 83-20.

**A.     The ALJ Reasonably Weighed the Medical Opinions and Evidence**

An ALJ makes a RFC determination by weighing all the relevant evidence of

record. 20 C.F.R. § 404.1545(a)(1); SSR 96-8p. In doing so, an ALJ must determine

what weight to give the opinions of a claimant's treating physician. 20 C.F.R. §

404.1527. A treating physician's opinion is entitled to controlling weight if it is

supported by the medical findings and not inconsistent with the other substantial evidence

in the record. 20 C.F.R. § 404.1527(d)(2); *Elder v. Astrue*, 529 F.3d 408, 415–46 (7th

Cir.2008); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). However, so long as

an ALJ "minimally articulates [her] reasons," she may discount a treating physician's

opinion if it is inconsistent with that of a consulting physician or other substantial medical

evidence. *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); *see also Schmidt v.*

*Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). "The ALJ is not required to give controlling weight to the ultimate conclusion of disability – a finding specifically reserved for the Commissioner." *Denton v. Astrue*, 596 F.3d 419, 424 (7th Cir.2010).

Claimant argues that the ALJ erred in weighing the medical opinions in this case. Claimant argues that the ALJ disregarded a significant portion of Dr. Devere's testimony regarding Claimant's fatigue and failed to explain why she rejected that testimony. Claimant Br. [Dkt.#19], at 6-7.

The ALJ, however, acknowledged that Claimant suffered some fatigue. R.78-79. Contrary to Claimant's argument, the ALJ inquired of Dr. Devere about Claimant's fatigue (R.43), and Dr. Devere acknowledged her complaints about fatigue and identified fatigue as a "acceptable symptom" (R.48). Dr. Devere also acknowledged that fatigue "is a serious complaint, a serious problem in MS" (R.48), but that the fatigue described by Claimant in her testimony at the hearing was not so documented in her medical records at the time in question (R.49). The ALJ further probed Dr. Devere, and Dr. Devere testified that although fatigue is a common symptom, Claimant could have done possibly light duty but giving Claimant the benefit of the doubt, a sedentary job would accommodate the limitations Claimant alleges. R.48 -50.

In determining Claimant's RFC in this case, the ALJ reasonably relied, in large part, on the longitudinal medical record of Claimant's then-treating physicians and reasonably gave more weight to the contemporaneous treating physicians' observations and course of treatment during the time in question on which Dr. Devere based his

opinion. The ALJ emphasized that Dr. Freeman had not examined Claimant and that Dr. Hentati had only started to treat Claimant in 2005. R.79.

It was reasonable for the ALJ to conclude that Dr. Freeman's opinion and Dr. Hentati's treatment history, which began over 14 years after the date last insured, do not overcome Claimant's longitudinal record in which there was no contemporaneous treating physician's opinion that Claimant was disabled at the time she was eligible for disability insurance benefits. Significantly, Drs. Hentati and Freeman simply concluded that Claimant was disabled during the time in question. That is a broad and vague conclusion. Neither doctor opined that Claimant was not capable of working during the period of time in question. Moreover, neither a consulting expert's opinion nor a treating physician's diagnosis and opinion that a claimant is disabled are sufficient to establish that the claimant is, in fact, "disabled" as defined in the Social Security Act because such an opinion with respect to a medical listing is an issue reserved solely for the ALJ to determine. *See* 42 U.S.C.A. § 405(g); 20 C.F.R. §§ 404.1527(e), 416.927(e).

Ultimately, the ALJ concurred with the medical expert Dr. Devere and assigned little weight to the conclusions of the non-treating physician Dr. Freeman and Claimant's treating physician Dr. Hentati. R.75, 79. In her opinion, the ALJ extensively detailed her review of Claimant's longitudinal medical records and also explained the reasons why she did not give great or controlling weight to Dr. Freeman or Dr. Hentati. R.78-79.

Based on the medical evidence in the record, the Court concludes that the ALJ was justified in giving controlling weight to Dr. Devere, whose opinion was amply supported

with objective evidence in the record. Therefore, because the ALJ relied upon objective medical evidence and clearly and comprehensively explained her rationale, the ALJ did not improperly deny weight to Dr. Freeman or Dr. Hentati's opinion, and there is substantial evidence in the record to support the findings of the ALJ.

## B. The ALJ's Credibility Determination Is Supported by Substantial Evidence

When faced with a claimant alleging subjective symptoms, an ALJ must evaluate the credibility of a claimant's testimony about her symptoms. SSR 96-7p. The ALJ must consider the testimony in light of the entire record and be "sufficiently specific" as to the reasons for her credibility determination. *Id.* Since the ALJ is in the best position to observe witnesses, her credibility finding will not be overturned as long as it has some support in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1178-1179 (7th Cir. 2001). An ALJ's credibility determination will be reversed only if the claimant can show it was "patently wrong." *Herr v. Sullivan*, 912 F.2d 178, 182 (7th Cir. 1990). A discrepancy between the reported complaints and the medical evidence is probative that a witness may be exaggerating her condition. *Powers v. Apfel*, 207 F.3d 431, 435-436 (7th Cir. 2000). The Seventh Circuit has recognized that an applicant for disability benefit may "have an incentive to exaggerate their symptoms," and therefore, "an administrative law judge is free to discount the applicant's testimony on the basis of other evidence in the case." *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006).

Claimant argues that the ALJ failed to follow SSR 96-7 because (1) the ALJ improperly used boilerplate language when analyzing Claimant's credibility; (2) the ALJ

19

had no reasonable basis for finding Claimant's testimony about her fatigue incredible; and (3) the ALJ inconsistently discredited Claimant without explanation by limiting her to sedentary work but crediting her testimony about her need to lie down. Claimant's Br. [Dkt.#19], at 8-9. We disagree.

In evaluating a claimant's credibility, it is not disputed that the ALJ must comply with SSR 96-7p and articulate her reasons for her credibility evaluations. *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003). As the Seventh Circuit explained in *Brindisi*, the ALJ's determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statement and the reasons for that weight." 315 F.3d at 787 (citation omitted).

First, Claimant argues that the ALJ improperly used boilerplate language when determining Claimant's credibility. This contention is simply inaccurate. The ALJ does not only use boilerplate language as Claimant suggests. Instead, the ALJ gives a detailed explanation and dedicates nearly two pages in her opinion to explain her adverse credibility finding. Unlike some of the recent cases from the Seventh Circuit criticizing use of the boilerplate language and remanding the cases to the SSA for further explanation, the ALJ in this case explained her adverse credibility determination in detail.

Specifically, the ALJ cited SSR 96-7p and identified and discussed relevant evidence to support her credibility finding. R.77-78. The ALJ concluded that Claimant's

"medically determinable impairment could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statement concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." R.78. The ALJ further explained that Claimant's "current allegations regarding her symptoms and limitation during the period at issue are far greater that the degree of limitation supported by objective evidence." R.79. While boilerplate language taken in isolation may not be permissible, such language with record support and reasoned analysis will satisfy an ALJ's obligation to articulate her reasons for her credibility evaluations.

In this case, the ALJ engaged in a detailed analysis of the record, including Claimant's treatment history from the alleged onset date after the date last insured and through the hearing. R.75-79. The ALJ found Claimant current allegations regarding her symptoms and limitation during the period at issue less than fully credible based upon the contemporaneous medical records from the period in question. R.79. This is not a case in which the ALJ's credibility finding lacks any explanation or support. In light of the various factors that contributed to the ALJ's credibility determination, the Court cannot say that the ALJ's judgment is "patently wrong."

Claimant also argues that the ALJ had no reasonable basis for finding Claimant's testimony about her fatigue incredible and also ignored certain evidence of her fatigue that contradicts her RFC finding that Claimant has the ability to perform work at the sedentary level of exertion. As the Seventh Circuit has recognized before, "an ALJ need

not mention every piece of evidence" (*Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010), an ALJ need only "minimally articulate his . . . justification for rejecting or accepting specific evidence of disability." *Scheck*, 357 F.3d at 700.

In her opinion, the ALJ did, in fact, acknowledge that Claimant complained of fatigue during the period of the time in question. R.78. The ALJ, however, found that her fatigue was not so disabling in light of the objective medical evidence that Claimant "remained relatively stable until she contracted a viral infection in 1993." R.78. The ALJ found that Claimant had the ability to perform work at a sedentary level of exertion which for the most part permits an individual to sit, and Claimant testified that during the time period in question, she had no limitation in her ability to sit. R.33. Indeed, the VE classified her past relevant work as sedentary. In the hypothetical posed to the VE, the ALJ inquired whether an individual could perform the same or similar past relevant work as Claimant with the following limitations: sitting for six to eight hours of the day; standing and walking at least two hours of the day; lifting and carrying, both frequently and occasionally up to ten pounds, with no other restrictions or limitations. R.63. The VE testified that based on the hypothetical given by the ALJ, an individual with the limitations described could perform Claimant's past relevant work. R.63.

It is true that an ALJ cannot disregard a claimant's subjective statements about disabling pain solely because they are not substantiated by objective medical evidence. *Id.*; 20 C.F.R. § 404.1529(c)(2); *Clifford v. Apfel*, 227 F.3d 863, 871–72 (7th Cir.2000). Instead, an ALJ should compare the consistency of a claimant's statements against

objective information in the medical record, and the credibility determination will only be disturbed if that finding is "unreasonable or unsupported." *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir.2006); SSR 96–7p. The Court cannot say, based on the record evidence, that the ALJ's determination that Claimant has the ability to perform work at the sedentary level of exertion was either unreasonable or unsupported. This is not a case in which the ALJ's RFC determination or credibility assessment lacks any explanation or support in the record. To the contrary, the ALJ reasonably relied on medical sources and record evidence to determine Claimant's RFC for sedentary work. For all of these reasons, the ALJ's credibility determination is upheld.

## C. The ALJ Did Not Err In Failing to Analyze the Onset Date of Disability

"SSR 83-20 addresses the situation in which an administrative law judge makes a finding that an individual is disabled as of an application date and the question arises as to whether the disability arose at an earlier time. " *Scheck v. Barnhart*, 357 F.3d 697, 701 (7th Cir. 2004). SSR 83-20 makes clear that once a determination of disability had been made "[t]he starting point in determining the date of onset of disability is the individual's statement as to when disability began." SSR-83-20. Although a claimant's alleged onset date is the starting point for determining the disability onset date, the ALJ need not adopt that date if it is unsupported by the medical evidence. *See Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

Here, Claimant argues that her case triggered SSR 83-20 and that, had the ALJ properly followed its framework, the ALJ would have been required to engage a medical

23

expert to establish the date when Claimant was first disabled.  We disagree.  Although the ALJ did not refer to SSR 83-20 specifically in her decision, this omission by itself is not reversible error.  *See Brisoce ex rel. Taylor v. Barnhart*, 425 F.3d 345, 353 (7th Cir. 2005) citing *Pugh v. Bowen*, 870 F.3d 1271, 1274 (7th Cir. 1989).  We must determine whether the ALJ nevertheless properly applied the requisite analysis. Our review of the ALJ's decision leads us to conclude that she did apply the requisite analysis and that her decision is supported by substantial evidence. Most significantly, although the ALJ did not reference SSR 83-20, she did, in fact, engage a medical expert to assist her in her evaluation of Claimant's allegations of disability and alleged onset date – which satisfies the exact requirements of SSR 83-20.

There can be no doubt that the ALJ agrees with Dr. Devere, Dr. Freeman and Dr. Hentati that Claimant currently is disabled.  R.16-17, 42.  The fundamental problem with Claimant's application for disability benefits is that she did not apply for benefits until more than 20 years after she stopped working and about 16 years after her insured status expired.  Though that, in and of itself, does not doom her application, the long lapse in time raises obvious evidentiary problems.  *See Eichstadt v. Astrue*, 534 F.3d 663, 666 (7th Cir. 2008).  The question presented to the ALJ is not whether Claimant is disabled today or whether she was disabled at the time she applied for disability benefits in 2008 but rather whether Claimant was disabled either at her alleged onset date of May 1990 or at least as of December 31, 1991, which is the date her insured status expired. Although the ALJ did not specifically pinpoint when Claimant's disability began, the ALJ concluded

with certainty that while Claimant had a severe impairment in 1990 and 1991, she was not disabled prior to December 31, 1991.

Claimant argues that "neither the ALJ nor Dr. Devere evaluated her condition after 1991 to inform her possible condition as the [date last insured.]" Claimant's Reply [Dkt.#31], at 16. That argument is not supported by the record. In her opinion, the ALJ clearly reviewed Claimant's medical records in their entirety and emphasizes notes taken by Drs. Bernstein, Davis, Lipton and Hentati throughout Claimant's medical history from 1988 through the hearing in 2008 in her discussion at step two of the analysis whether Claimant had an impairment that met or medically equaled on of the listed impairments. R.75-77.

In this case, the ALJ sufficiently explained her reasons for relying on and rejecting certain evidence, and substantial evidence supports her determination that Claimant was not under a disability prior to December 31, 1991. In reaching her conclusion, the ALJ discussed the objective medical evidence she considered and sought expertise from Dr. Devere to assist in that determination.[7] Specifically, the ALJ explained that Dr. Lipton noted that, prior to her 1993 exacerbation, Claimant "had reported only that she could no

---

[7] According to SSR 83-20, the ALJ must consider the claimant's allegations, the claimant's work history, and medical and other evidence in determining onset date. SSR 83-20 acknowledges that "[w]ith slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling," particularly when the date last worked is "far in the past and adequate medical records are not available." SSR 83-20. In such cases, SSR 83-20 instructs the ALJ to "infer the onset date" from the evidence but required the ALJ's judgment "have a legitimate medical basis" and further provides that the ALJ should call on a medical expert when onset must be inferred." SSR 83-20.

longer run, jump, stand for long periods, or walk the required distances in shopping malls." R.76. The ALJ further noted that "in January 1991 and again in January 1993, [Claimant] denied that walking was a problem, stating that she did not need to hold onto anything and she required no assistance device; at least as of January 1991, she only had mild numbness and tingling." R.76. With regard to fatigue, the ALJ noted that although Claimant had complained of fatigue as early as January 1991, "significant fatigue is not initially documented in occupational therapy notes until January 1993, at which time [Claimant] complained of a three week history of increasing leg fatigue and extreme general fatigue." R.77. The ALJ further explained, however, that "[e]ven then, [Claimant] continued to perform her tasks as a homemaker and mother of two young children; she took a trip to Disney World in January 1996, and more that 8 years after the expiration of her insured status, in June 1999, [she] was still painting and doing arts and crafts." R.77.

Claimant now asserts almost twenty years later that she became disabled in May 1990 and therefore is entitled to disability benefits to date. Claimant, however, did not submit any contemporaneous opinion from a treating physician that she was disabled or unable to work during the time in question up until the date she last was insured when she was last eligible for benefits. There can be no doubt that Claimant suffers from an extremely debilitating disease that has rendered her seriously disabled today and for some years prior to today. That, however, is not properly considered by the Court in reviewing

whether substantial evidence supports the ALJ's finding that Claimant failed to establish that she was disabled prior to her date last insured.[8]

The only way in which Claimant would qualify for benefits in 2008 is if the SSA determined she was disabled before December 31, 1991 – 16 years prior. That precisely is the analysis the ALJ undertook, and ultimately, the ALJ determined that Claimant was not, in fact, disabled as of her alleged onset date of May 1990 or prior to December 31, 1991.[9] The ALJ here was not necessarily required to specifically pinpoint Claimant's onset date of disability, but rather whether the onset date came before her date last insured. Here, the ALJ evaluated the factors listed in SSR 83-20, including Claimant's alleged onset date, her work history, and the medical and other relevant evidence that described and illustrated the progression of her multiple sclerosis. The ALJ also engaged the assistance of a medical expert to review Claimant's medical records.

---

[8] The Seventh Circuit has recognized that worsening of a claimant's condition after the date last insured does not provide a basis for granting benefits during the relevant time period. *See Thomas v. Astrue*, 352 F. App'x 115, 116 (7th Cir. 2009) (affirming ALJ decision even though there were significant symptoms just after the date last insured because the physicians who evaluates the claimant before the date last insured found his leukemia to be asymptomatic).

[9] Very recently, the Seventh Circuit affirmed a case in which the claimant suffered a variety of chronic illnesses, including coronary artery disease and neurological symptoms, and where the date last insured was much closer to the date of the Claimant's application for benefits than in the instant case. *See Martinez v. Astrue*, 2011 WL 148810 (7th Cir. Jan. 19, 2011). In *Martinez*, the Seventh Circuit affirmed the district court's opinion affirming the ALJ's determination that "[i]n the brief but critical window" between the date of last insured at the end of 2003 and when the claimant applied for benefits in 2004, she was not disabled. 2011 WL 148810, at *6. Although the claimant appeared to be currently disabled, the ALJ had determined that she was not disabled on the date of last insured. *Id.* The Seventh Circuit held that the ALJ had conducted a thorough analysis in concluding that as of the date last insured, the combination of her conditions merely limited her to performing sedentary work, which was the kind of work she had performed before she had first become seriously ill.

After careful review of the ALJ's opinion, the Court finds that the ALJ reasonably concluded that, notwithstanding her current condition, Claimant was not disabled prior to her date last insured. Or, said another way, there is substantial evidence in the record that supports the ALJ's conclusion that the onset date for Claimant's disability occurred sometime after December 31, 1991.

## IV. CONCLUSION

For the reasons set forth in the Court's Memorandum Opinion and Order, Claimant's motion for summary judgment [Dkt.#19] is denied. Respondent Michael Astrue's motion for summary judgment [Dkt.#26] is granted, and the decision of the Commissioner of Social Security is affirmed.

It is so ordered.

_____
Jeffrey T. Gilbert
United States Magistrate Judge


Dated: December 22, 2011